2001 ME 129

**Steven ALEXANDER**

v.

**PORTLAND NATURAL GAS et al.**

Supreme Judicial Court of Maine.

Argued: June 13, 2001.
Decided: Aug. 7, 2001.

James J. MacAdam, Alexander F. McCann, MacAdam McCann, South Portland, Maine, for the employee.

Thomas Quartararo, Thomas R. Kelly, Robinson, Kriger & McCallum, Portland, Maine, for the employer.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Portland Natural Gas (PNG) appeals from a decision of a Hearing Officer of the Workers' Compensation Board granting Steven Alexander's petition for an award. Applying 39–A M.R.S.A. § 102(4)(B) (2001), the Hearing Officer calculated an average weekly wage of $2,056.16. PNG contends, however, that subsection B cannot be "fairly applied" because, in the years immediately preceding the injury, Alexander had earned an average of $19,000 annually, and the application of paragraph B results in a greatly inflated average weekly wage reflecting an annual income exceeding $100,000. *See* 39–A M.R.S.A. § 102(4)(D) (2001). We agree with PNG that the Hearing Officer erred by failing to consider the so-called "fallback" provision, 39–A M.R.S.A. § 102(4)(D) (2001), to determine the employee's average weekly wage. Accordingly, we vacate and remand to the Board for a new calculation of the average weekly wage, and for a new determination of the employee's level of incapacity.

## I. FACTS

[¶ 2] Prior to his work-related injuries, Steven Alexander worked on pipeline construction projects for over thirty years. He became a side-boom operator in 1975, and for 29 years, he had worked for a single employer. That employer provides pipeline workers and boom operators to pipeline projects around the United States and the world. Alexander testified that, prior to 1995, he worked year-round, taking one to three weeks off in between projects. In 1995, Alexander had a "falling out" with his employer and voluntarily reduced his workload. He testified that "[i]n 1995, Uncle Sam took a lot more of my money in taxes than I appreciated, and I just decided that my kids were grown and I didn't need to make that much money, and I just kind of took a break for those two years." Alexander reported annual earnings, for tax purposes, of $18,232 in 1996 and $19,477 in 1997.

[¶ 3] In July 1998, Alexander began work on a gas pipeline project in Maine for PNG.[1] The Maine pipeline project was scheduled to last between four and six months. Alexander suffered compensable injuries on July 30, 1998, and October 30, 1998. As a result of his injuries, Alexander was, at his request, laid off in October 1998 and remained out of work until August 1999, when he returned to work as a side-boom operator for a different company, Delta Gulf, with special work accommodations. He was laid off by Delta Gulf in October 1999 as part of a general layoff.

[¶ 4] Alexander filed petitions for an award of workers' compensation benefits relating to his injuries while employed at PNG. Alexander contended before the Hearing Officer that his average weekly wage should be calculated pursuant to 39–

---

1. Alexander worked for Gregory & Cook, a subcontractor of PNG. Pursuant to the subcontract, PNG provided workers' compensation insurance for Gregory & Cook employees. There is no dispute that PNG is the "employer" for purposes of workers' compensation liability.

A M.R.S.A. § 102(4)(B), based on his earnings during the PNG project. PNG argued for a more flexible approach pursuant to subsection 102(4)(D), which requires, in part, that the party asserting application of subsection D provide evidence of the earnings of comparable employees. *Bossie v. S.A.D. # 24*, 1997 ME 233, ¶ 5, 706 A.2d 578, 579–80. PNG's evidence consisted of a stipulation between the parties that the comparable "boom operators all made comparable wages [to] Mr. Alexander, which is anywhere between ... $1,800 to $2,200 and $2,400 a week." PNG also presented evidence that side-boom operators typically work discrete jobs for several months with breaks of varying lengths between jobs and that Alexander had intentionally reduced employment after 1995.

[¶ 5] Applying subsection 102(4)(B), the Hearing Officer calculated an average weekly wage of $2,056.16, a figure derived by dividing Alexander's total earnings from PNG by the number of weeks he worked for PNG. The Hearing Officer rejected PNG's evidence of comparable employees, stating:

> The parties' agreement that employees comparable to Mr. Alexander earned between $2200.00 and $2400.00 a week adds little to the analysis. Assuming that that agreement fulfills the employer's obligation to produce the wages of comparable employees, Mr. Alexander['s] wage must be computed under § 102(4)(B) of the Act. Mr. Alexander did not work for the employer nor have earning[s] regular enough to compute his wage under subsection (A); the work he did was not seasonal; thus Mr. Alexander's wage falls under subsection (B)

and his earning[s] must be divided by ... the number of weeks worked. This indeed yields a wage very close to the wage of the comparable employee[s].

[¶ 6] The Hearing Officer awarded ongoing "total compensation"[2] benefits with an offset for his temporary period of post-injury employment at Delta Gulf. The Hearing Officer concluded that Alexander's employment at Delta Gulf did not reflect a post-injury work-capacity, stating:

> I accept Mr. Alexander's testimony that Delta Gulf accommodated him in order to get him to work for them for that short time by giving him a ride to his home much the way Portland gas pipeline did for him after the July 19, 1998 injury and also by limiting the amount he had to lift and even enabling him to see a chiropractor three times a week while he was on the job. His earning[s] for Delta Gulf therefore [are] not a[n] accurate reflection of his post injury earning capacity. *Hardy v. Trailer Sales*, 448 A.2d 895 (Me.1982).

[¶ 7] The Hearing Officer denied PNG's motion for further findings of fact and conclusions of law, and we granted PNG's petition for appellate review pursuant to 39–A M.R.S.A. § 322 (2001).

## II. ANALYSIS

A. Average weekly wage

■ [¶ 8] Incapacity benefits are calculated as 80% of the difference between an employee's after-tax average weekly wage at the time of the injury and the employee's post-injury earning capacity, if any. 39–A M.R.S.A. §§ 212–214 (2001).

---

2. The Hearing Officer awarded "total compensation," but did not specify whether the award was for total incapacity benefits pursuant to 39–A M.R.S.A. § 212 (2001), or 100% partial incapacity benefits pursuant to 39–A M.R.S.A. §§ 213, 214 (2001). Because the Hearing Officer used the phrase "total compensation," we assume that the Hearing Officer awarded benefits for total incapacity pursuant to 39–A M.R.S.A. § 212.

The average weekly wage is intended to provide a fair and reasonable estimate of what the employee in question would have been able to earn in the labor market in the absence of a work-injury. As we have stated, "[t]he purpose of calculating an average weekly wage is to arrive at an estimate of the 'employee's future earning capacity as fairly as possible.' " *Nielsen v. Burnham & Morrill, Inc.*, 600 A.2d 1111, 1112 (Me.1991) (quoting *Fowler v. First Nat'l Stores, Inc.*, 416 A.2d 1258, 1260 (Me.1980)).

[¶ 9] Calculation of the "average weekly wage" is governed by four alternative methods outlined in 39–A M.R.S.A. §§ 102(4)(A), (B), (C) & (D) (2001). Paragraph 102(4)(A) applies to employees who have worked at least 200 days in the year prior to the injury and is inapplicable here. 39–A M.R.S.A. § 102(4)(A) (2001).[3] Paragraph 102(4)(B) applies to employees who worked less than 200 days in the year preceding the injury, or whose earnings during that year have varied from week to week.[4] Paragraph B provides:

**B.** When the employment or occupation did not continue pursuant to paragraph A for 200 full working days, "average weekly wages, earnings or salary" is determined by dividing the entire amount of wages or salary earned by the injured employee during the immediately preceding year by the total number of weeks, any part of which the employee worked during the same period. The week in which employment began, if it began during the year immediately preceding the injury, and the week in which the injury occurred, together with the amounts earned in those weeks, may not be considered in computations under this paragraph if their inclusion would reduce the average weekly wages, earnings or salary.

39–A M.R.S.A. § 102(4)(B). Paragraph 102(4)(C) applies to "seasonal employees," and neither party contends that Alexander was a seasonal employee. 39–A M.R.S.A. § 102(4)(C) (2001).[5]

[¶ 10] Paragraph 102(4)(D) is a fallback provision, applicable when none of the foregoing methods can be "reasonably and fairly applied." 39–A M.R.S.A. § 102(4)(D). Paragraph D provides:

**D.** When the methods set out in paragraph A, B or C of arriving at the

---

**3.** Subsection 102(4)(A) provides, in pertinent part:

**A.** "Average weekly wages, earnings or salary" of an injured employee means the amount that the employee was receiving at the time of the injury for the hours and days constituting a regular full working week in the employment or occupation in which the employee was engaged when injured.... In the case of piece workers and other employees whose wages during that year have generally varied from week to week, wages are averaged in accordance with the method provided under paragraph B.
39–A M.R.S.A. § 102(4)(A) (2001).

**4.** The "vary from week to week" criterion is derived from the last sentence of subsection 102(4)(A). 39–A M.R.S.A. § 102(4)(A).

**5.** Paragraph C provides:

**C.** Notwithstanding paragraphs A and B, the average weekly wage of a seasonal worker is determined by dividing the employee's total wages, earnings or salary for the prior calendar year by 52.
**(1)** For the purpose of this paragraph, the term 'seasonal worker' does not include any employee who is customarily employed, full time or part time, for more than 26 weeks in a calendar year. The employee need not be employed by the same employer during this period to fall within this exclusion.
**(2)** Notwithstanding subparagraph (1), the term 'seasonal worker' includes, but is not limited to, any employee who is employed directly in agriculture or in the harvesting or initial hauling of forest products.
39–A M.R.S.A. § 102(4)(C) (2001).

average weekly wages, earnings or salary of the injured employee can not reasonably and fairly be applied, "average weekly wages" means the sum, having regard to the previous wages, earnings or salary of the injured employee and of other employees of the same or most similar class working in the same or most similar employment in the same or a neighboring locality, that reasonably represents the weekly earning capacity of the injured employee in the employment in which the employee at the time of the injury was working.

39–A M.R.S.A. § 102(4)(D).

■ [¶ 11] We have said that the methods in section 102(4) should be applied in the order listed whenever possible. *Frank v. Manpower Temp. Servs.*, 687 A.2d 623, 625 (Me.1996); *Landry v. Bates Fabrics, Inc.*, 389 A.2d 311, 312 (Me.1978). Alexander contends that, once it is determined that paragraphs A, B, or C can be applied in a given situation, it is erroneous to apply paragraph D. We disagree. As a matter of logic, one of the paragraphs, either A, B, or C, can be applied in all employment cases. The employee's interpretation, therefore, would preclude the application of paragraph D in all cases. By its plain language, paragraph D is not triggered when the preceding paragraphs *cannot be applied;* but rather, it is triggered when they cannot *"reasonably and fairly* be applied." 39–A M.R.S.A. § 102(4)(D). The Hearing Officer may not rule out resorting to the fallback provision simply because one of the preceding paragraphs is applicable on its face. Paragraph D applies to all cases in which the ordinary calculation methods would lead to an unfair or unreasonable result.

■ [¶ 12] PNG persuasively contends that the Hearing Officer should have considered paragraph D in the present case. Paragraph B looks only to the employee's earnings with the employer at the time of the injury, regardless of the brevity of that employment, or the employee's intermittent relationship to the labor market. 39–A M.R.S.A. § 102(4)(B). The fact that employment is of a very short duration does not preclude a reasonable and fair application of paragraph B when the facts suggest that the employee had established a new occupation, which, but for the injury, would have yielded a fair estimate of the employee's uninjured earning capacity. *See Fowler,* 416 A.2d at 1260 (stating that paragraph B applicable when employee promoted to new occupation one week prior to injury).[6] When the employment does not establish a new occupation, however, but reflects part of a pattern of discrete, short-term employments, paragraph B may result in an inflated average weekly wage.

■ [¶ 13] Alexander's relationship with the labor market, at least since 1995, consisted of a series of discrete, short-term employments which can best be described as "consistently intermittent." *See* 5 A. LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 93.02[3][c] (2000). It is generally accepted that, in order to fairly and accurately determine the average weekly wage in cases of consistently intermittent employment, the factfinder should consider whether the employee's part-time employment is a matter of choice or due to a temporary industry-wide work slowdown. *Id.* at 93.02[2][d]. In some cases, when the employee is willing

---

6. In *Fowler v. First Nat'l Stores, Inc.*, 416 A.2d 1258, 1260 (Me.1980), we interpreted the predecessor statute to subsection 102(4), former 39 M.R.S.A. § 2(2) (1989), *repealed and re-* placed by P.L.1991, ch. 885, §§ A–7, A–8, which contained substantially similar language.

to work full-time, but the employee's recent work history is consistently intermittent due to a general economic slowdown, it may not be fair to assume that the work slowdown will continue into the indefinite future. In such situations, it may be fairer to treat the employee as a full-time employee for purposes of calculating the average weekly wage. *Id.* When the employee voluntarily limits employment to part-time work, however, it is often appropriate to look to the fall-back method to determine the average weekly wage. *Id.* at § 93.02[3][c]. *See also Bossie v. S.A.D. # 24,* 1997 ME 233, ¶¶ 5–6, 706 A.2d 578, 579–80; *St. Pierre v. St. Regis Paper Co.,* 386 A.2d 714, 718–19 (Me.1978).

[¶ 14] In *Bossie,* for example, the employee worked as a cook in a school cafeteria for twenty-four years prior to her work-related injury, working 36 weeks a year from August to June. *Bossie,* 1997 ME 233, ¶ 2, 706 A.2d at 579. Because the employee worked too many weeks to fall within the seasonal worker statute, and because paragraph B would result in an inflated wage, the hearing officer applied the fallback provision. *Id.*

[¶ 15] We agreed in dicta that paragraph D may have been the best calculation method under the circumstances:

> S.A.D. # 24 argues that although subsection B is applicable on its face, subsection D would be the best method for calculating the average weekly wage of an employee, like Bossie, with a long-term history of employment for substantially less than the normal full working year. As Professor Larson states in his treatise, the average weekly wage determination is not based solely on what that employee is theoretically capable of earning, but on the employee's actual work-history, e.g., the employee's willingness to work full-time and the availability of full-time employment in the

competitive labor market. 2 A. Larson, The Law of Workmen's Compensation, §§ 60.21(c), 60.22(a) (1993). Professor Larson is critical of jurisdictions that determine the earnings of long-term part-time employees based on what those employees might earn in hypothetical full-time employment:

> The flaw in this reasoning is that the purpose of the wage calculation is not to arrive at some theoretical concept of loss of earning capacity; rather it is to make a realistic judgment on what the claimant's future loss is in the light of all the factors that are known. One of these factors is the established fact of claimant's choice of a part-time relation to the labor market. If this is clear, *and above all there is no reason to suppose it will change in the future period into which the disability extends,* then it is unrealistic to turn a part-time able-bodied worker into a full-time disabled worker.
>
> . . . .*Id.* at § 60.21(c)
>
> ... [W]e agree with S.A.D. # 24 that subsection D might have been the best method of determining the average weekly wage in this case. . . .

*Id.* at ¶¶ 5–6, 706 A.2d at 579–80. (emphasis in original). Although we agreed that paragraph D might provide the best method for determining the employee's average weekly wage in *Bossie,* we vacated the Hearing Officer's decision because the employer failed to offer into evidence the earnings of comparable employees. *Id.* at ¶ 6, 706 A.2d at 580–81; *see also St. Pierre,* 386 A.2d at 718–19.

[¶ 16] In the present case, on the other hand, PNG duly met the evidentiary requirements of paragraph D. First, PNG presented evidence of the earnings of comparable employees to establish Alexander's average weekly earnings during the pipeline project. Second, PNG offered evi-

dence to establish that pipeline projects, in general, are of limited duration, and that Alexander's relationship to the labor market was consistently intermittent. The Hearing Officer declined to apply paragraph D, however, concluding that the calculation prescribed by paragraph B "yields a wage very close to the wage of the comparable employee[s]," who "earned between $2200.00 and $2400.00." Accordingly, the Hearing Officer concluded that examination of the earnings of comparable employees "adds little to the analysis." To the extent that the Hearing Officer considered paragraph D, the Hearing Officer appears to have concluded that in order for the evidence of comparable employees to be useful, the party asserting application of paragraph D must provide not only evidence of the earnings of comparable employees, but evidence of comparable employees whose relationship to the labor market matches that of the employee. We disagree.

[¶ 17] By its express language, paragraph D requires the factfinder to give "regard to the previous wages, earnings or salary *of the injured employee,*" in addition to the earnings of comparable employees. 39–A M.R.S.A. § 102(4)(D) (emphasis added). Subsection D is flexible and does not require rigid adherence to any mathematical formula. *See, e.g., Roberts v. Smith,* 415 A.2d 1089, 1090 (Me. 1980) ("it [is] not necessary that [the] computation reflect an exact average of other employees' actual earnings"). As we have noted,

> [the fallback provision] in effect broadly requires regard to be given to any factors relevant in determining the injured employee's earning capacity on his job

just prior to the injury.... Under appropriate circumstances [the fallback provision's] reference to 'the previous wages, earnings or salary of the injured employee' must be extended to wages received from other employers; that is, the scope of the search for relevant evidence of the employee's own earning capacity under [the fallback provision] extends beyond computing the arithmetic averages of the prior wages he had received from a single employer prescribed by paragraphs A and B.

*St. Pierre,* 386 A.2d at 719.[7]

[¶ 18] Paragraph D is intended to apply to unique employment situations like those present here. Conceivably, none of PNG's employees may have fit the mold of a "consistently intermittent" employee with earnings similar to Alexander. Paragraph D does not require employers to perform a nationwide search for comparable employees. It permits the Hearing Officer to consider the employee's own earnings and the employee's own unique relationship with the labor market. PNG provided evidence of the earnings of comparable employees and evidence that Alexander's relationship to the labor market was "consistently intermittent." 5 A. Larson, LARSON'S WORKERS' COMPENSATION LAW § 93.02[3][c]. Under these facts, we conclude that the Hearing Officer erred by failing to consider 102(4)(D) because paragraph B can not be reasonably and fairly applied.

### B. Determination of incapacity

[¶ 19] PNG next challenges the Hearing Officer's award of total incapacity

---

7. In *St. Pierre,* 386 A.2d 714, 718–19 (Me. 1978), and *Roberts v. Smith,* 415 A.2d 1089, 1090 (Me.1980), we interpreted the predecessor statute to paragraph 102(4)(D), former 39 M.R.S.A. § 2(2)(C) (1989), *repealed and replaced by* P.L.1991, ch. 885, §§ A–7, A–8, which contained virtually identical language.

benefits.[8] An employee can prove entitlement to total incapacity benefits by showing: (1) the unavailability of work within the employee's local labor market; and (2) the physical inability to perform full-time work in the statewide labor market, regardless of availability. *See Lamphier v. Bath Iron Works Corp.*, 2000 ME 121, ¶ 1, 755 A.2d 489, 490; *Adams v. Mt. Blue Health Ctr.*, 1999 ME 105, ¶ 18, 735 A.2d 478, 483–84.

[¶ 20] The Hearing Officer stated: "Even assuming that Mr. Alexander could find work in a competitive labor market within his limitations for ten dollars an hour for forty hours a week, he would continue to be entitled to total compensation." We agree with PNG that this statement is erroneous on its face. The physical ability to perform full-time work in the competitive labor market precludes an award of "total compensation" pursuant to the total incapacity statute. *Lamphier*, 2000 ME 121, at ¶ 1, 755 A.2d at 490; *Adams*, 1999 ME 105, at ¶ 18, 735 A.2d at 483–84.

[¶ 21] Alexander contends that the Hearing Officer's use of the phrase "total compensation" was not intended to refer to total incapacity benefits pursuant to section 212, but to the maximum level of partial benefits permissible under the Act. *See* 39–A M.R.S.A. §§ 211, 213 (2001). Workers' compensation benefits are capped at a maximum dollar amount as provided in 39–A M.R.S.A. § 211 (2001).

Alexander contends that, because his average weekly wage was calculated at over $2,000 a week, he would be limited to the maximum level of benefits even if he returned to work earning $10 an hour for a forty-hour work week. *See* 39–A M.R.S.A. § 213(1) (2001) (Partial benefits are calculated as 80% the difference between the employee's after-tax average weekly wage and post-injury wages).

[¶ 22] Nevertheless, because partial incapacity benefits are potentially subject to a maximum week-limitation, *see* 39–A M.R.S.A. § 213, and total incapacity benefits have no such limitation, *see* 39–A M.R.S.A. § 212, the applicable statute can have important long-term consequences to the employer and employee. PNG is, therefore, entitled to a determination as to whether Alexander is physically able to perform full-time work in the statewide labor market in order to determine whether Alexander is entitled to benefits pursuant to section 212 or section 213. Moreover, because the Hearing Officer's determination of incapacity was based on the employee's average weekly wage, and because the Hearing Officer may have erred in its determination of that wage, we must remand to the Board for a new calculation of Alexander's entitlement to incapacity benefits.

[¶ 23] Finally, PNG contends that the Hearing Officer erred, as a matter of law, in suggesting that accommodations made by the Delta Gulf, during Alexan-

---

8.  The total incapacity statute provides, in pertinent part:

    **1. Total incapacity.** While the incapacity for work resulting from the injury is total, the employer shall pay the injured employee a weekly compensation equal to 80% of the employee's after-tax average weekly wage, but not more than the maximum benefit under section 211. Compensation must be paid for the duration of the incapacity.

Any employee who is able to perform full-time remunerative work in the ordinary competitive labor market in the State, regardless of the availability of such work in and around that employee's community, is not eligible for compensation under this section, but may be eligible for compensation under section 213.

  . . . .

39–A   M.R.S.A. § 212(1) (2001).

der's post-injury employment, automatically prevents the employment from being regarded as reflecting his post-injury earning capacity. We disagree with PNG's contentions that the Hearing Officer's findings reflect an automatic assumption that, just because the employer accommodated the injury, the employment must be discounted out of hand. As we have stated, the fact that the employee is earning the same or more after the injury than before does not preclude a finding of an earning incapacity. *Severy v. S.D. Warren Co.,* 402 A.2d 53, 55 (Me.1979). In light of the substantial job-modifications made by the employer to accommodate Alexander's work-injuries, the Hearing Officer's finding that Alexander's short-term employment with Delta Gulf did not reflect the employee's post-injury earning capacity was not clearly erroneous.

## III. CONCLUSION

[¶ 24] In summary, the Hearing Officer erred by failing to consider the fallback provision in 39–A M.R.S.A. § 102(4)(D) when determining the employee's average weekly wage; and it was error for the Hearing Officer to award "total compensation" without a determination of the employee's physical capacity to perform full-time work in the statewide labor market, as required by 39–A M.R.S.A. § 212(1). Moreover, because the Hearing Officer's determination of incapacity was based on a potentially erroneous determination of the average weekly wage, we remand to the Board for a new determination of the employee's incapacity.

The entry is:

The decision of the Workers' Compensation Board is vacated. Remanded to the Workers' Compensation Board for further proceedings consistent with the opinion herein.

WATHEN, C.J., with whom CLIFFORD, J. and CALKINS, J., join, dissenting.

[¶ 25] I must respectfully dissent. The Court finds that because Alexander's relationship with the labor market consisted of a "series of discrete, short-term employments which can best be described as 'consistently intermittent,' " subsection B of 39–A M.R.S.A. § 102(4) may result in an inflated average weekly wage and thus the hearing officer should have applied subsection D. To apply subsection D, however, due regard must be given both to Alexander's own previous earnings and to "the earnings of other employees of the same or most similar class working in the same or most similar employment in the same or a neighboring locality." 39–A M.R.S.A. § 102(4)(D); *St. Pierre v. St. Regis Paper Co.,* 386 A.2d 714, 719 (Me.1978). As the party asserting application of subsection D, PNG bore the burden to provide evidence of the earnings of comparable employees. *See Bossie v. Sch. Admin. Dist. No. 24,* 1997 ME 233, ¶ 6, 706 A.2d 578. Even if subsection D is the best approach for calculating average weekly wage under these circumstances, I do not agree that PNG carried that burden in this case. Although the parties stipulated to the amount comparable employees earned per week, PNG provided no evidence of the number of weeks per year comparable employees worked. Without that information, the basis for comparison is incomplete and the hearing officer was justified in relying on subsection B.

I would affirm.