MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 74
Docket:       WCB-24-339
Argued:       June 5, 2025
Decided:      August 14, 2025

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

LORRI BOSSE

v.

SARGENT CORPORATION et al.

CONNORS, J.

[¶1]  Sargent Corporation and Cross Insurance TPA, Inc. (collectively

Sargent) appeal from a decision of the Workers' Compensation Board Appellate

Division granting Lorri Bosse's petition for award of benefits.  The applicable

statute, 39-A M.R.S. § 102(4)(A)-(D) (2025), provides for an injured employee's

average weekly wages (AWW) to be computed in one of four ways, depending

on the circumstances.[1]  The Administrative Law Judge (ALJ) applied the method

---

[1]  The statute provides:

   **A.**  "Average weekly wages, earnings or salary" of an injured employee means the
   amount that the employee was receiving at the time of the injury for the hours and
   days constituting a regular full working week in the employment or occupation in
   which the employee was engaged when injured; except that this does not include any
   reasonable and customary allowance given to the employee by the employer for the
   purchase, maintenance or use of any chainsaws or skidders used in the employee's
   occupation if that employment or occupation had continued on the part of the
   employer for at least 200 full working days during the year immediately preceding
   that injury.  For purposes of this paragraph, "reasonable and customary allowance" is

2

set forth in paragraph B, and the Appellate Division affirmed the ALJ's decision.

Sargent argues that the facts compelled the application of paragraph D, which

is applicable only if the other methods "can not reasonably and fairly be

the allowance provided in a negotiated contract between the employee and the employer or, if not provided for by a negotiated contract, an allowance determined by the Department of Labor. In the case of piece workers and other employees whose wages during that year have generally varied from week to week, wages are averaged in accordance with the method provided under paragraph B.

**B.** When the employment or occupation did not continue pursuant to paragraph A for 200 full working days, "average weekly wages, earnings or salary" is determined by dividing the entire amount of wages or salary earned by the injured employee during the immediately preceding year by the total number of weeks, any part of which the employee worked during the same period. The week in which employment began, if it began during the year immediately preceding the injury, and the week in which the injury occurred, together with the amounts earned in those weeks, may not be considered in computations under this paragraph if their inclusion would reduce the average weekly wages, earnings or salary.

**C.** Notwithstanding paragraphs A and B, the average weekly wage of a seasonal worker is determined by dividing the employee's total wages, earnings or salary for the prior calendar year by 52.

**(1)** For the purposes of this paragraph, the term "seasonal worker" does not include any employee who is customarily employed, full time or part time, for more than 26 weeks in a calendar year. The employee need not be employed by the same employer during this period to fall within this exclusion.

**(2)** Notwithstanding subparagraph (1), the term "seasonal worker" includes, but is not limited to, any employee who is employed directly in agriculture or in the harvesting or initial hauling of forest products.

**D.** When the methods set out in paragraph A, B or C of arriving at the average weekly wages, earnings or salary of the injured employee can not reasonably and fairly be applied, "average weekly wages" means the sum, having regard to the previous wages, earnings or salary of the injured employee and of other employees of the same or most similar class working in the same or most similar employment in the same or a neighboring locality, that reasonably represents the weekly earning capacity of the injured employee in the employment in which the employee at the time of the injury was working.

39-A M.R.S. § 102(4)(A)-(D) (2025).

applied." 39-A M.R.S. § 102(4)(D). We disagree with Sargent and affirm. In doing so, we explain the parameters of the Board's discretion in choosing between these two methods when addressing how to compute the AWW of an employee who consistently works more than 26 weeks, *see* 39-A M.R.S. § 102(4)(C), but fewer than 200 full working days, *see* 39-A M.R.S. § 102(4)(A)-(B), in the year preceding an injury, and the application of paragraph B results in a significant difference between past wages earned and the workers' compensation award.

## I.  BACKGROUND

[¶2]  Lorri Bosse has worked as a truck driver for many years.[2]  From 2000 to 2009, she was self-employed.  Throughout this period, Bosse drove trucks year-round, and during the busy season, from April to early December, she worked eighty to one hundred hours per week.

[¶3]  From 2009 to 2011, she worked as a truck driver for Gendron & Gendron, a construction firm.  Gendron & Gendron laid off Bosse during the winter months each year.

---

[2] We set forth the factual findings of the ALJ.  *See* 39-A M.R.S. § 318 (2025) ("The administrative law judge's decision, in the absence of fraud, on all questions of fact is final . . . ."); *Doucette v. Hallsmith/Sysco Food Servs., Inc.*, 2011 ME 68, ¶ 21, 21 A.3d 99 ("[O]ur appellate review of workers' compensation cases is limited to errors of law . . . .").

4

[¶4]  Bosse left Gendron & Gendron in 2011 and went to work as a truck driver for Sargent, where she drove primarily dump trucks and often worked fifty to seventy hours per week.  Sargent also laid off Bosse during the winter months and rehired her each spring.  Not all truck drivers were laid off at Sargent during the winter; layoffs were based on seniority and performance reviews.  Bosse did not choose to be laid off and would have worked year-round had Sargent permitted her to do so.

[¶5]  In 2011, Bosse experienced low back pain and missed some time from work.  In 2015, she began experiencing hip pain.  She was taken out of work in October 2015 for back and hip pain.[3]  In November 2015, Bosse filed a petition for award of workers' compensation benefits alleging a gradual work injury arising out of her work for Sargent.  She filed an amended petition in April 2016.  She identified her injury as occurring on August 4, 2015.  Bosse worked thirty out of the fifty-two weeks preceding her injury.

[¶6]  Following an evidentiary hearing, an ALJ (*Goodnough, ALJ*) granted Bosse's petition in January 2018, awarding her a closed-end period of total incapacity benefits corresponding to her hip surgery and recovery period as well as ongoing partial incapacity benefits related to her back problem.  In

---

[3]  A left hip replacement in 2016 alleviated Bosse's hip symptoms, but she continued to experience low-back pain.

calculating Bosse's AWW, the ALJ applied paragraph B rather than the fallback provision, paragraph D, as Sargent requested. Sargent filed a motion for further findings of fact and conclusions of law, and the ALJ issued an amended decision but did not alter his conclusions.

[¶7] Sargent appealed to the Appellate Division, which, inter alia, remanded for "a determination of whether [method B] was the appropriate method to use to calculate the [AWW]" because it "f[ound] no competent evidence to support the ALJ's factual finding that Ms. Bosse's employment immediately prior to her employment with Sargent was year-round."[4] *See Bosse v. Sargent Corp.*, Me. W.C.B. No. 21-12, ¶¶ 6, 19 (App. Div. 2021).

[¶8] After a hearing in June 2022 where the ALJ (*Rooks, ALJ*) heard additional testimony on the AWW issue, the ALJ issued a decision in February 2023 in which she struck the factual finding that Bosse had worked year-round at Gendron & Gendron but again calculated Bosse's AWW pursuant to paragraph B. Sargent again filed a motion for further findings of fact and conclusions of law, which the ALJ denied.

---

[4] The Appellate Division stated that "undisputed testimony at the hearing demonstrate[d] that Ms. Bosse was subject to seasonal winter layoffs during the two years she worked at Gendron & Gendron, from 2009 to 2011, immediately before going to work for Sargent." *Bosse v. Sargent Corp.*, Me. W.C.B. No. 21-12, ¶ 11 (App. Div. 2021). The Appellate Division added that there was "no reason to doubt that Ms. Bosse had worked consistently year-round prior to starting her employment at Gendron & Gendron in 2009." *Id.*

6

[¶9]   Sargent appealed a second time to the Appellate Division, which issued a decision in July 2024.  *See Bosse v. Sargent Corp.*, Me. W.C.B. No. 24-10, ¶ 5 (App. Div. 2024).   The Appellate Division affirmed the ALJ's decision, including the determination that paragraph B could fairly and reasonably be applied to calculate Bosse's AWW.  *Id.* ¶¶ 18-20; *see* 39-A M.R.S. § 102(4)(B), (D). The Appellate Division rejected Sargent's contentions that (as paraphrased by the Appellate Division) "the AWW as calculated under paragraph B is unduly inflated and does not reflect Ms. Bosse's future ability to earn" and that "the ALJ applied an incorrect legal standard when determining that it was not 'per se unreasonable' to apply paragraph B in the circumstances."[5]  *Id.* ¶ 16.

[¶10]  Sargent timely filed a notice of appeal and, soon after, a petition for appellate review, which we granted in January 2025.  *See* 39-A M.R.S. § 322(1), (3) (2025); M.R. App. P. 23(a), (b)(2).

---

[5] Sargent points out that Bosse's AWW calculated pursuant to paragraph B translates to an annual award greater than her actual past wages while working for Sargent.  In the twelve months prior to her injury, Bosse earned $34,535.41.  These earnings are representative of Bosse's annual income while employed at Sargent.  In 2011, she earned $21,997.62; in 2012, she earned $26,158.78; in 2013, she earned $33,201.44; in 2014, she earned $31,299.65; and in 2015, she earned $32,144.59.  The undisturbed conclusion of the first ALJ (*Goodnough, ALJ*) who considered this case was that Bosse's AWW, calculated pursuant to paragraph B, is $1,157.35, which translates to an annual award of $60,182.20.  *See* 39-A M.R.S. § 102(4)(B).

## II. DISCUSSION

[¶11] The ALJ's findings of fact reflect, and the parties acknowledge, that neither paragraph A nor paragraph C applies. *See* 39-A M.R.S. § 102(4)(A), (C). Paragraph D is a "fallback provision" applicable when the methods prescribed by paragraphs A, B, and C cannot "reasonably and fairly be applied." *Alexander v. Portland Nat. Gas,* 2001 ME 129, ¶ 10, 778 A.2d 343; 39-A M.R.S. § 102(4)(D).[6] The question presented, therefore, is whether it was fair and reasonable to apply paragraph B, which is applicable "to employees who worked less than 200 days in the year preceding the injury, or whose earnings during that year have varied from week to week," or whether the facts compel the resort to fallback paragraph D. *Id.* ¶ 9; *see* 39-A M.R.S. § 102(4)(A)-(B), (D).

**A.    Standard of Review: If we determine that the statutory text is ambiguous after examining its purpose and structure, we defer to the Board's interpretation so long as it is reasonable in light of the statute's legislative history; but we give no deference to the Board's interpretation of our precedent.**

[¶12] As noted above, we accept the ALJ's findings of fact as final. *See supra* ¶ 2 n.2. As to questions of law:

---

[6] *See also Bossie v. Sch. Admin. Dist. No. 24*, 1997 ME 233, ¶ 3, 706 A.2d 578 ("The selection of the proper method for determining the [AWW] proceeds sequentially through four alternative provisions outlined in [39-A M.R.S. § 102(4)(A)-(D)]."); *Frank v. Manpower Temp. Servs.*, 687 A.2d 623, 625 (Me. 1996) (stating that "[w]hen Paragraphs A, B or C are not appropriate, the [AWW] is to be calculated pursuant to Paragraph D" and that "the methods of computing the [AWW] described in Paragraphs A, B and C . . . are to be applied in the order stated").

We review decisions of the Appellate Division according to established principles of administrative law . . . . We afford appropriate deference to the Appellate Division's reasonable interpretation of the workers' compensation statute and will uphold the Appellate Division's interpretation unless the plain language of the statute and its legislative history compel a contrary result. In interpreting the Workers' Compensation Act, we look to the plain meaning of the statutory language, and construe that language to avoid absurd, illogical, or inconsistent results. The Act must be construed neutrally so as not to favor either the employee or the employer.

Although we afford appropriate deference to the Appellate Division's reasonable interpretation of the workers' compensation statute, when the ultimate issue is the proper interpretation of judicial precedent, we are not obligated to defer to the Appellate Division's interpretation of that precedent. Accordingly, we interpret judicial precedent de novo.

*Michaud v. Caribou Ford-Mercury, Inc.*, 2024 ME 74, ¶¶ 12-13, 327 A.3d 38

(citations and quotation marks omitted).[7] The ultimate goal is to give effect to

---

[7] We have consistently stated that we defer to the Board's reasonable interpretation of the Workers' Compensation Act "according to established principles of administrative law." *E.g.*, *Bailey v. City of Lewiston*, 2017 ME 160, ¶ 9, 168 A.3d 762. Under those established principles, we do not defer to an interpretation of an administrative body unless and until we have determined that the statutory language is ambiguous and we have first attempted unsuccessfully to resolve that ambiguity by looking to the statute's purpose and structure; in addition, the administrative body's statutory interpretation must be reasonable in light of the statute's legislative history. *See Guilford Transp. Indus. v. Pub. Utils. Comm'n*, 2000 ME 31, ¶ 11, 746 A.2d 910 ("If the statute is plain, we give effect to the unambiguous intent of the Legislature. If the statute is ambiguous, however, we review whether the agency's construction is reasonable." (citations omitted)); *Cent. Maine Power Co. v. Pub. Utils. Comm'n,* 436 A.2d 880, 885 (Me. 1981) (stating that deference to the Public Utilities Commission's statutory interpretation "must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute itself"); *State v. York Utils. Co.,* 142 Me. 40, 43-44, 45 A.2d 634, 635-36 (1946) (holding that an agency's longstanding interpretation of a statute cannot overcome the clear meaning of that statute); *Allied Res., Inc. v. Dep't of Pub. Safety*, 2010 ME 64, ¶ 21, 999 A.2d 940 ("To determine the reasonableness of an agency's interpretation, we examine the legislative history as well as the context of the whole statutory scheme of which the section at issue forms a part, so that a harmonious result, presumably the intent

the Legislature's intent. *See Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me. 1994).

**B.** **The text, purpose, structure, and legislative history of section 102(4) do not clearly establish when paragraph B cannot "reasonably and fairly be applied," but they indicate that exceptional circumstances must be present to justify the application of fallback paragraph D.**

[¶13] The test set forth in the statutory text as to when to resort to fallback method D is whether the application of paragraphs A, B, or C would be unreasonable and unfair. *See* 39-A M.R.S. § 102(4)(D) (stating that paragraph D applies "[w]hen the methods set out in paragraph A, B or C of arriving at the [AWW], earnings or salary of the injured employee can not reasonably and fairly be applied"). To avoid constitutional concerns, we must give these terms sufficient specificity so as to avoid inconsistent application by the Board. *See Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 15, 977 A.2d 400 ("[L]egislation delegating discretionary authority to an administrative agency is unconstitutional if it fails to contain standards sufficient to guide

---

of the Legislature, may be achieved." (quotation marks omitted)); *State v. Ray,* 1999 ME 167, ¶ 7, 741 A.2d 455 (stating that undefined statutory terms must be "given their everyday meaning and that meaning must be consistent with the overall statutory context and must be construed in the light of the subject matter, the purpose of the statute and the consequences of a particular interpretation" (citation and quotation marks omitted)); *Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me. 1994) (stating that we construe statutory language in light of the whole statutory scheme, and if the language remains ambiguous, we "examine other indicia of legislative intent," including legislative history, while affording the Board's interpretation of the Workers' Compensation Act "great deference" (quotation marks omitted)).

administrative action." (quotation marks omitted)); *Anderson v. Town of Durham*, 2006 ME 39, ¶ 19, 895 A.2d 944 (reciting "the basic principle of statutory construction that this Court is bound to avoid an unconstitutional construction of a statute if a reasonable interpretation of the statute would satisfy constitutional requirements" (quotation marks omitted)).

[¶14] We have stated that the purpose of the AWW calculation as defined in section 102(4) is to estimate what an injured worker could earn but for the injury.[8] The text and structure of the statute also indicate that paragraph B is the appropriate method for calculating the AWW of an employee who, like Bosse, worked more than 26 weeks, *see* 39-A M.R.S. § 102(4)(C), but fewer than 200 days, *see* 39-A M.R.S. § 102(4)(A)-(B), in the year before her injury.[9] Hence,

---

[8] *See Alexander v. Portland Nat. Gas*, 2001 ME 129, ¶ 8, 778 A.2d 343 ("The average weekly wage is intended to provide a fair and reasonable estimate of what the employee in question would have been able to earn in the labor market in the absence of a work-injury."); *Frank*, 687 A.2d at 625 ("The purpose of the [AWW] calculation is to arrive at an estimate of the employee's *future earning capacity* as fairly as possible." (quotation marks omitted)); *Landry v. Bates Fabrics, Inc.*, 389 A.2d 311, 313 (Me. 1978) (explaining that Maine's statutory workers' compensation scheme "provides a method of predicting what the employee would continue to earn had no injury occurred" and that "[i]t is the ability to work at available full-time employment in the future that should be compensated").

[9] Subsection 102(4) establishes clear, specific circumstances for the application of each paragraph. *See* 39-A M.R.S. § 102(4)(A)-(C). Paragraph A applies when an employee has worked for the employer for at least 200 full working days during the year immediately preceding the injury, 39-A M.R.S. § 102(4)(A)-(B); paragraph B applies when the employee's wages during the previous year "have generally varied from week to week" and "the employment or occupation did not continue pursuant to paragraph A for 200 full working days," 39-A M.R.S. § 102(4)(A)-(B); and paragraph C applies to "seasonal worker[s]," defined to exclude "any employee who is customarily employed, full time or part time, for more than 26 weeks in a calendar year," 39-A M.R.S. § 102(4)(C). Most significantly, the Maine Legislature's unique treatment of seasonal workers suggests that it considered employment lasting for longer than twenty-six weeks in the calendar year preceding a

paragraph B must be applied except where exceptional circumstances indicate that doing so would produce an unfair, inaccurate, or unrealistic estimate of the injured worker's future earning capacity.

**C.** **According to our precedent, several factors are relevant when determining whether to deviate from paragraph B, including (1) whether the worker's history of less-than-full-time employment was voluntary and (2) whether the AWW computation under paragraph B would be greatly inflated compared to actual past earnings.**

[¶15]   We have previously identified multiple factors relevant to the determination of whether an injured employee's AWW cannot be calculated pursuant to paragraph B because its application would yield an unreasonable or unfair estimate of that worker's earning capacity.  In *Bossie v. Sch. Admin. Dist. No. 24*, 1997 ME 233, ¶ 6, 706 A.2d 578, we suggested, in dictum, that paragraph D "might have been the best method of determining" the worker's

---

worker's injury sufficiently addressed by paragraphs A and B and undeserving of specific treatment beyond the methods stated in those paragraphs.  *See* 39-A M.R.S. § 102(4)(A)-(C).  (The current definition of "seasonal worker" contained in paragraph C was added to Maine's workers' compensation statute in 1991 and became effective on January 1, 1993.  *See* P.L. 1991, ch. 885, § A-8 (effective Jan. 1, 1993) (codified at 39-A M.R.S. § 102(4)(C) (2025)).)

Sargent appears to be advocating for what the ALJ described as "a back-door seasonal worker calculation (i.e., division of all wages by 52)," even though Sargent concedes that Bosse is not a seasonal worker because she worked more than twenty-six weeks in the year preceding her injury.  *See* 39-A M.R.S. § 102(4)(C).  We agree with the ALJ's conclusion on this point: "If the legislature wanted to treat in a special fashion, as a matter of course, those workers who are employed greater than 26, but less than 52, weeks in the year prior to injury, it could certainly have done so," but instead, "[a] line was apparently drawn at 26 weeks, and that is the current benchmark[.]"

AWW in that case.[10]  There, the injured worker was employed as a school cook for twenty-four years, and she worked during the school year, which lasted thirty-six weeks, from August to June.  *Id*. ¶ 2.  The employer argued for the application of paragraph D, claiming that the application of paragraph B "would lead to an inflated" AWW.  *Id*. ¶ 4.  While, as noted above, the statutory purpose is to identify an injured worker's future earning capacity, we stated in *Bossie* that the AWW determination "is not based solely on what that employee is theoretically capable of earning, but on the employee's actual work-history, e.g., the employee's willingness to work full-time and the availability of full-time employment in the competitive labor market."  *Id*. ¶ 5.

[¶16]  Subsequently, in *Alexander*, the Board had calculated the worker's AWW pursuant to paragraph B, and the employer argued on appeal that paragraph B could not be fairly applied because the application of paragraph B resulted in a "greatly inflated" AWW.[11]  2001 ME 129, ¶ 1, 778 A.2d 343.  We vacated the Board's ruling and remanded for consideration of paragraph D.  *Id*.

---

[10] We nevertheless upheld the application of paragraph B because the employer had not provided evidence of the earnings of comparable employees, as expressly required by paragraph D.  *Bossie*, 1997 ME 233, ¶¶ 4-6, 706 A.2d 578; *see* 39-A M.R.S. § 102(4)(D).

[11] *See Alexander*, 2001 ME 129, ¶ 1, 778 A.2d 343 (explaining that the employer contended that paragraph B could not be fairly applied "because, in the years immediately preceding the injury, Alexander had earned an average of $19,000 annually, and the application of paragraph B result[ed] in a greatly inflated average weekly wage reflecting an annual income exceeding $100,000.").

In so ruling, we stated that paragraph D could apply when the application of paragraph B results in an unfairly inflated AWW compared to past actual wages where those wages reflected "a pattern of discrete, short-term employments."

*Id.* ¶¶ 1, 12. We explained:

> It is generally accepted that, in order to fairly and accurately determine the average weekly wage in cases of consistently intermittent employment, the factfinder should consider whether the employee's part-time employment is a matter of choice or due to a temporary industry-wide work slowdown. In some cases, when the employee is willing to work full-time, but the employee's recent work history is consistently intermittent due to a general economic slowdown, it may not be fair to assume that the work slowdown will continue into the indefinite future. In such situations, it may be fairer to treat the employee as a full-time employee for purposes of calculating the average weekly wage. When the employee voluntarily limits employment to part-time work, however, it is often appropriate to look to the fall-back method to determine the average weekly wage.

*Id.* ¶ 13 (citations omitted).

[¶17] Thus, in both *Bossie* and *Alexander*, we identified two circumstances that could justify consideration of paragraph D: (1) the employee had not worked full-time in the past *by choice*[12] and (2) the

---

[12] In *Alexander*, 2001 ME 129, ¶¶ 12-13, 778 A.2d 343, we concluded that "Alexander's relationship with the labor market, at least since 1995, consisted of a series of discrete, short-term employments which [could] best be described as 'consistently intermittent'" and that the application of paragraph B could result in an inflated AWW. This conclusion was supported by the following facts:

> Alexander worked on pipeline construction projects for over thirty years. He became a side-boom operator in 1975, and for 29 years, he had worked for a single

14

application of paragraph B resulted in an annual award that was greatly inflated compared to the worker's actual past wages. Importantly, both circumstances were identified in the context of pursuing the statutory goal of calculating an AWW that realistically reflected the employee's future earning capacity; the statute does not focus on actual earnings except when they are relevant to determining future earning capacity.[13]

---

employer. That employer provide[d] pipeline workers and boom operators to pipeline projects around the United States and the world. Alexander testified that, prior to 1995, he worked year-round, taking one to three weeks off in between projects. In 1995, Alexander had a "falling out" with his employer and voluntarily reduced his workload. He testified that "[i]n 1995, Uncle Sam took a lot more of my money in taxes than I appreciated, and I just decided that my kids were grown and I didn't need to make that much money, and I just kind of took a break for those two years."

*Id.* ¶ 2.

[13] Other jurisdictions considering cases involving a difference between an injured employee's past earnings and the employee's earning capacity have similarly concluded that their workers' compensation schemes focus on the latter. *E.g.*, *Carter v. Ocean Accident & Guarantee Corp.*, 11 S.E.2d 16, 18 (Ga. 1940) ("The courts are not concerned with whether the employee receives more compensation than his wages total, nor whether regular employees or temporary employees are given an advantage over the other, so long as the [workmen's compensation] statute is given its true and fair meaning. These are matters for legislative concern. . . . The one high aim constituting the foundation of this law is compensation for an injured employee in proportion to his loss on account of the injury. That loss is deprivation of future earnings, and is measured by his proved earning capacity."); *Goytia v. Workmen's Comp. Appeals Bd.*, 493 P.2d 864, 866 (Cal. 1972) ("Since the 'earning capacity' concept, as created by the [state workers' compensation statute], was to be utilized to estimate the monetary effects of a disability on *future* earnings, 'earning capacity' c[an] not be locked into a straight-jacket of the actual earnings of the worker at the date of injury, but instead the term contemplates the employee's general over-all capability and productivity . . . ." (citation modified)); *Lubbock Indep. Sch. Dist. v. Bradley*, 579 S.W.2d 78, 81 (Tex. Civ. App. 1979) ("The law seeks to provide compensation not merely for loss of earnings, but for loss of earning capacity, at a wage rate based on the employee's capacity to earn when employed on a full-time basis." (citations omitted)); *Furrowh v. Abacus Corp.*, 559 A.2d 1258, 1260 (Del. 1989) ("[T]his Court [has] found that [the state's workers' compensation statute] should be read as requiring that a part-time employee who was capable of working full time should be compensated based on his loss of earning capacity (rather than on his mere loss of part-time earnings).")

**D.** **The Board reasonably applied relevant factors in identifying Bosse's realistic future earning capacity.**

[¶18]  As noted above, the ALJ concluded that the difference between Bosse's actual earnings and the AWW calculated by applying paragraph B was not so large that it "per se" compelled the application of paragraph D.  The ALJ also considered that Bosse's annual lay-off at Sargent was not a matter of choice.  Bosse testified that she "hated" being laid off and that she would have preferred to work year-round.  In addition, other truck drivers employed by Sargent did work full-time during the winter months, not only driving the same type of truck that Bosse did but sometimes even driving her specific truck.  Lay-offs were based on seniority and performance reviews, and Bosse was a good and hard worker.  Thus, there was a realistic possibility that Bosse would have been employed by Sargent year-round as a truck-driver in the future if not for her injury.

[¶19]  Moreover, Bosse's injury affects her earning capacity year-round, not just during the months she has regularly worked for Sargent.  The record demonstrates that in the past she has received additional income during layoff periods by working elsewhere or collecting unemployment benefits.  These facts, viewed collectively, support the conclusion that, despite a significant disparity between Bosse's actual wages from Sargent and the AWW

computation under paragraph B, it was nonetheless fair and reasonable to apply paragraph B to determine Bosse's future year-round earning capacity.

[¶20]  Notably, Bosse's situation is different from, for example, that of a teacher, for whom the time spent not working, i.e., the summer months, is inherent to the nature of the employment.  *See Bossie*, 1997 ME 233, ¶ 5, 706 A.2d 578 (discussing the example of a teacher who is paid each month for nine months of the year and explaining that "there is no reason to calculate [the teacher's] earning capacity on the unrealistic basis" of the same monthly salary for twelve months, adding that "the purpose of the wage calculation is not to arrive at some theoretical concept of loss of earning capacity" but "to make a realistic judgment on what the claimant's future loss is in the light of all the factors that are known" (quoting A. Larson & Lex K. Larson, The Law of Workmen's Compensation §§ 60.21(c), 60.22(a) (1993))).

[¶21] In sum, the test to determine whether to apply paragraph D instead of paragraph B involves consideration of all factors relevant to a realistic determination of future earning capacity.[14]  These factors may include, but are

---

[14] As one treatise explains:

> The entire objective of wage calculation is to arrive at a fair approximation of [a] claimant's probable future earning capacity.  This worker's disability reaches into the future, not the past; the loss as a result of injury must be thought of in terms of its impact on probable future earnings, perhaps for the rest of the worker's life.  This may sound like belaboring the obvious; but unless the elementary guiding principle

not limited to, the size of the difference between an employee's actual past wages and the annual award as calculated pursuant to paragraph B; whether an annual lay-off or other period of unemployment was voluntary; whether working fewer than fifty-two weeks each year is a characteristic of the occupation; and whether there was a realistic possibility that the employee's *future* wages would resemble the AWW calculated under paragraph B.

[¶22]  While a large difference between actual past earnings and the AWW as calculated pursuant to paragraph B is one relevant consideration in determining whether paragraph B can be reasonably and fairly applied, *see* 39-A M.R.S. § 102(4)(D), this factor is only a starting point; the *cause* of that difference is of equal relevance in determining the worker's realistic future earning capacity.  Given the governing test and the facts presented here,[15] the Board's decision to apply paragraph B to calculate Bosse's AWW did not constitute legal error and was not arbitrary or capricious.  *See Somers v. S.D.*

---

is kept constantly in mind while dealing with wage calculation, there may be a temptation to lapse into the fallacy of supposing that compensation theory is necessarily satisfied when a mechanical representation of this claimant's own earnings in some arbitrary past period has been used as a wage basis.

1 A Larson & Thomas A. Robinson, Larson's Workers' Compensation Law § 93.01(1)(g) (2025) (footnote omitted).

[15]  Sargent bore the burden to provide evidence to support application of paragraph D.  *See Bossie*, 1997 ME 233, ¶ 6, 706 A.2d 578.

*Warren Co.*, 2020 ME 137, ¶ 14, 242 A.3d 1091 (noting that we will vacate a workers' compensation decision only "where that decision violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; or is affected by bias or an error of law" (quotation marks omitted)).

### III.  CONCLUSION

[¶23]  When an injured worker has not worked at least 200 days in the year prior to an injury but has worked over 26 weeks during that year, paragraph B of section 102(4) generally applies to compute the worker's average weekly wage.  *See* 39-A M.R.S. § 102(4)(A)-(C).  If the application of paragraph B results in a large difference between the worker's AWW and actual past wages, and the employer argues that given this difference the application of paragraph B is unreasonable and unfair and the ALJ should instead calculate the worker's AWW pursuant to paragraph D, then the ALJ should evaluate the reasons for that difference in order to further the overarching goal of identifying the injured worker's realistic future earning capacity.  These factors include, but are not limited to, whether the worker's history of not working full-time was voluntary; whether not working all the months of the year was characteristic of the employment; and whether working full-time in the future

was a realistic possibility.  The Board applied the correct test here, properly examining these factors.

The entry is:

Judgment affirmed.

---

Robert W. Bower, Jr., Esq., and Christopher M. Schlundt, Esq. (orally), Norman Hanson DeTroy, LLC, Portland, for appellants Sargent Corporation and Cross Insurance TPA, Inc.

James J. MacAdam, Esq. (orally), MacAdam Law Offices, P.A. Freeport, for appellee Lorri Bosse

Workers' Compensation Board Appellate Division docket number 23-12
FOR CLERK REFERENCE ONLY